GLENN E. SOLOMON (SBN 155674)
PETER STROTZ (SBN 129904)
JONATHAN SHIN (SBN 287602)
**KING & SPALDING LLP**
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
Telephone:  (213) 443-4355
Facsimile:    (213) 443-4310
Email: *gsolomon@kslaw.com*
         *pstrotz@kslaw.com*
         *jshin@kslaw.com*

Attorneys for Plaintiff
Bond Pharmacy, Inc. d/b/a Advanced Infusion Solutions

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BOND PHARMACY, INC. D/B/A ADVANCED INFUSION SOLUTIONS<br><br>Plaintiff,<br><br>v.<br><br>BLUE SHIELD OF CALIFORNIA LIFE & HEALTH INSURANCE, a for-profit corporation; CALIFORNIA PHYSICIANS' SERVICE dba BLUE SHIELD OF CALIFORNIA; and DOES 1-10 inclusive,<br><br>Defendants. | Case No. 3:22-cv-021329-JD<br><br>**COMPLAINT FOR:**<br><br>**(1) BREACH OF IMPLIED-IN-FACT CONTRACT;**<br>**(2) BREACH OF IMPLIED-IN-LAW CONTRACT;**<br>**(3) FAILURE TO PROVIDE ERISA BENFITS – ERISA SECTION 1132(A)(1)(B);**<br>**(4) FAILURE TO PROPERLY HANDLE CLAIMS – ERISA SECTION 1132(A)(3)**<br>**(5) BREACH OF CONTRACT BY ASSIGNMENT;**<br>**(6) SERVICES RENDERED;**<br>**(7) UNFAIR BUSINESS PRACTICES;**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Bond Pharmacy, Inc., d/b/a Advanced Infusion Solutions (hereinafter referred to as "AIS Healthcare") complains and alleges as follows:

## I.    JURISDICTION AND VENUE

1.    The Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because this is an action between citizens of a State and a citizen or subject of a foreign state and/or there is complete diversity between the parties, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

2.    AIS Healthcare brings this action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1002 *et seq*.; and pursuant to the laws of the State of California.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because the action arises under the laws of the United States; and pursuant to 29 U.S.C. § 1132(e)(1), because the action seeks to enforce rights under ERISA.  Subject matter jurisdiction over any related state law claims is appropriate under 28 U.S.C. § 1367 and the doctrines of ancillary and pendent jurisdiction, because there is a common nucleus of facts relating to Defendants' wrongful behavior.

3.    This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the patients who received home infusion therapy and medications rendered by AIS Healthcare and covered by Defendants reside in this Judicial District, and a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this Judicial District.

## II.    THE PARTIES

4.    AIS Healthcare is a Mississippi-based compounding pharmacy and home infusion therapy provider which treats patients nationwide, including in the State of California.  AIS Healthcare provides industry-leading specialized home infusion therapy and related services, including care coordination and management patient training, administrative services, pharmacy services, billing services, and

/ / /

patient support.  AIS Healthcare is accredited by both the Utilization Review Accreditation Commission ("URAC") and the Accreditation Commission for Health Care ("ACHC") to provide these services, as a home infusion therapy supplier and specialty compounding pharmacy.  AIS Healthcare's home infusion therapy services allow patients suffering severe conditions, like cancer and multiple sclerosis, to receive custom medications, made by AIS for each patient, through surgically-implanted "pain pumps" that continuously infuse the intrathecal space surrounding the spinal cord with targeted pain medication on a daily basis over several months without having to see a healthcare provider to refill the pump. This infusion treatment allows patients, who are largely ambulatory, to go on with their daily lives while receiving this vital treatment.

5.     AIS Healthcare is incorporated under the laws of the State of Mississippi, and has its principal place of business in Ridgeland, Mississippi.

6.     AIS Healthcare is informed and believes that defendants Blue Shield of California Life & Health Insurance ("BSC Life") and California Physicians' Service, doing business as Blue Shield of California ("BSC", and together with BSC Life, "Blue Shield") are corporations duly organized and existing under the laws of the State of California and are authorized to transact, and are in fact transacting, the business of insurance in California.  AIS Healthcare also is informed and believes that BSC is licensed by the Department of Managed Health Care ("DMHC") to operate as a health care service plan pursuant to the Knox-Keene Health Care Service Plan Act of 1975 ("Knox-Keene Act"), Health and Safety Code sections 1340 *et seq.,* and the regulations promulgated thereunder. AIS Healthcare also is informed and believes that BSC Life is regulated by the California Department of Insurance under the California Insurance Code.

7.     AIS Healthcare is informed and believes that Blue Shield's principal place of business is in California, and that Blue Shield provides health coverage to

/ / /

plan members that receive home infusion therapy services and medications from AIS Healthcare.

8.    AIS Healthcare also is informed and believes that Blue Shield administers claims or benefit plans for other payors whose insureds are treated by AIS Healthcare (the "Other Payors").  AIS Healthcare is informed and believes that Blue Shield is either an independent contractor of or the agent for the Other Payors. AIS Healthcare is informed and believes that Blue Shield plays a core role for the Other Payors in that it effectively controls the decision whether to honor or deny a claim under the plans, or the amount of the payment under the plans.  AIS Healthcare is informed and believes that Blue Shield functions as the plan administrator in: (a) authorizing the provision of services to the Other Payors' members; (b) receiving bills from providers; (c) pricing bills from providers; (d) processing and administering the bills and appeals; (e) approving or denying the bills; (f) deciding not to arrange for transfer of members to in-network hospitals for post-stabilization services; (g) directing whether and how to pay bills; (h) issuing remittance advices and explanations of benefits on the bills; (i) communicating with providers regarding bills and services; (j) communicating with members regarding the bills and services; and (k) issuing payment.  AIS Healthcare is informed and believes that Blue Shield is in possession, custody, or control for the Other Payors of all facts, information and data concerning and related to the authorization, processing, pricing and payment of all bills submitted by AIS Healthcare for services rendered to patients whose plans are administered by Blue Shield.

9.    AIS Healthcare is further informed and believes that some of the Other Payors or plans are regulated by the Employee Retirement Income Security Act of 1974 ("ERISA"), and that Blue Shield acts as and has been delegated the responsibilities of a plan administrator for those ERISA plans.  Accordingly, Blue Shield is a proper ERISA defendant because it "effectively controlled the decision

/ / /

whether to honor or to deny a claim...." *Cyr v. Reliance Life Ins. Co.,* 642 F.3d 1202, 1204 (9th Cir. 2011) (en banc).

10.    AIS Healthcare does not know the true names or capacities, whether individual, corporate, associate, or otherwise, of defendant DOES 1 through 10, and therefore designates those defendants by such fictitious names.  Each of the defendants sued herein as a DOE is legally responsible in some manner for the events and happenings referred to and proximately caused the injuries suffered by plaintiff.  AIS Healthcare will amend this complaint to allege the true names and capacities of these DOES when the same becomes known to AIS Healthcare.  DOES and Blue Shield are collectively referred to herein as "Defendants."

## III.    ALLEGATIONS COMMON TO ALL CLAIMS

### A. AIS Provides Specialized Home Infusion Therapy Services

11.    AIS, a licensed pharmacy in all 50 US states, is the only home infusion therapy provider accredited by both URAC and ACHC.

12.    Home infusion therapy is a treatment regimen of services and supplies required for the infusion of medication in an outpatient setting by needle, catheter, or other non-oral means typically at a patient's home.

13.    A home infusion therapy provider is a pharmacy-based, decentralized patient care organization with expertise in USP 797-compliant sterile drug compounding that provides care to patients with acute or chronic conditions generally pertaining to parenteral administration of drugs, biologics and nutritional formulae administered through catheters and/or needles in home and alternate sites. Extensive professional pharmacy services, care coordination, infusion nursing services, supplies and equipment are provided to optimize efficacy and compliance. A home infusion therapy provider is typically a licensed and accredited pharmacy that provides various services in connection with home infusion therapy, including

/ / /

/ / /

medication delivery, pharmacy services, care coordination and management
services, and other administrative functions.[1]

14.     Home infusion therapy has substantial and well-recognized benefits
for patients and payors.  By receiving treatment at home or other outpatient
locations, patients are able to resume normal lifestyles and work activities while
receiving treatment. Home infusion therapy is also far less costly than inpatient
treatment at a hospital or nursing facility and reduces the risk of this high-risk
patient population contracting a hospital acquired infection.

15.     AIS offers a specialized kind of home infusion therapy whereby
medications are infused through implantable intrathecal "pain pumps."  These
pumps are surgically placed under the patient's skin and filled with medication that
the pump then continuously infuses through a catheter to the spinal theca, the fluid-
filled space between the thin layers of tissue that cover the spinal cord, wherever
the patient is located.[2]  Because the medication is infused into the intrathecal space
on a daily basis for extended periods (e.g., 30-180 days between refills) the
medication must not only be of the highest quality, free of contaminants; it must
also be made to remain stable and potent for that same period of time.

16.     Services necessary for the administration of the infusion therapy
regimen include the preparation and dispensing of the medication for filling of the
implanted pain pump with the medication and the continuous infusing of the
prepared medication by the pain pump into the intrathecal space on a daily basis.

17.     Physicians often prescribe home infusion therapy with implanted pain
pumps for patients with severe chronic pain because they lessen chronic pain and

---

[1] NHIA National Coding Standard for Home Infusion Claims under HIPAA, at 6-7
(Jan. 1, 2020), https://www.nhia.org/wp-
content/uploads/2020/04/NHIA_Code_Std_2020_1.11.01i1.pdf (last visited
February 22, 2023) ("NHIA Standards")

[2] MAYFIELD CLINIC, *Pain Pump*, at 1, https://d2uko0fg0ksrq5.cloudfront.net/pe-pain-pump-
snsi.pdf (last visited May 16, 2021).

COMPLAINT; DEMAND FOR JURY TRIAL

muscle spasticity caused by cerebral palsy, multiple sclerosis, stroke, brain injury, spinal cord injuries, cancer, and other systemic conditions.[3]

18.    Use of an implanted pain pump for infusing medication carries other significant benefits.  It helps avoid the abuse and diversion that has plagued the use of oral opioids because dosage is reduced and controlled.[4]  Because the pump delivers medication directly to the spinal theca, side effects are significantly reduced as compared to oral opioids, and patients need only receive about 1/300th of the typical oral dose.[5]

19.    Implanted pain pumps can infuse a patient's medication daily for up to 180 days.  This is possible only because of the efforts of highly-trained pharmacists that use special techniques and procedures to compound these sensitive and high-risk medications.  Compounding is the process in which medications are prepared, mixed, assembled and/or altered in custom, personalized formulations to fit a patient's unique needs that cannot be met with bulk produced or commercially available medications.  In addition to patients' specialized needs, there are other risks inherent with compounded medications used for infusion by pain pump that necessitate extra care in compounding.  Because the medication is infused directly into the space surrounding the spinal cord, dosage and formulation are more sensitive and the need for high levels of sterility and quality are intensified.  Because there is relatively no immune system in the intrathecal space, for example, any mistake in compounding could have dire consequences.  Thus, each patient's medication must be compounded according to unique specifications and using a level of care that exceeds normal pharmaceutical standards.  Otherwise, the medication may not properly infuse, the pump could be damaged, and patients could die.

---

[3] *Id.* at 1-2.

[4] *Id.* at 1.

[5] *Id.*

COMPLAINT; DEMAND FOR JURY TRIAL

20.     To produce the highest quality medications that can be properly infused through implanted pain pumps for up to 180 days, AIS has made substantial investments in its compounding processes and technology and undertakes costly, technical, and specialized pharmaceutical operations.  AIS operates highly developed, specialty compounding pharmacies that prepare medications of the highest quality and sterility and accurately deliver these compounded prescriptions to patients across the country.

21.     First, AIS coordinates directly with each patient's treating physician to develop the formulation needed based on the patient's particular needs.  To accomplish this, AIS consults with each patient's treating physician to help determine the proper formulation, potency and dosing of the drugs that will comprise the compounded medication.   AIS then compounds a trial dose which it dispenses to the patient as a test to ensure that it is safe and effective for use in that patient.

22.     The compounding process then begins with verification and review of each individual order by two pharmacy technicians and two pharmacists all verify and review each individual order.  This step helps assure the right formulation and dose for each patient and reduces the chance of error.  The formulations for use with an implanted pain pump must be developed in consultation with each patient's treating provider.

23.     Compounding is performed only by pharmacists specially trained in high-risk sterile compounding who are required to undergo regularly scheduled examinations and whose shifts are limited to two hours to ensure optimal focus.  In contrast, standard pharmacy practice allows for compounding by a single pharmacy technician supervised by a single pharmacist.  Compounding at AIS is performed only with the highest quality, certified source materials from US Food and Drug Administration ("FDA") registered companies. And, all stock solutions are

/ / /

prepared by licensed pharmacists and tested by third-party independent laboratories for sterility, potency and particulate matter, among other things, before they are used in compounding.

24.    AIS has devoted significant resources to develop a process to assure sterility of these medications.  This process starts with AIS's investment in industry leading compounding-pharmacy clean rooms.  These clean rooms meet or exceed industry standards.  Prior to entering the clean room, all pharmacists and other staff enter a gowning room where they put on sterile scrubs and change into full body, non-shedding garb including hood, masks, goggles, boots and gloves in an air-filtered environment.

25.    Inside the compounding room, direct compounding is performed only by pharmacists, who are the only ones permitted in the room during the compounding process.  Specialty syringe tray packs are used on an integrating laminar airflow bench under compounding hoods, which is designed to exchange the air in the direct compounding area to prevent contamination from airborne particulates.  The direct compounding area itself is disinfected at least every half hour, plus immediately before and after compounding.  Each cleaning is performed using sterile cleaning products and sporicidals.  All of this is in addition to thorough morning, midday and evening cleanings, and weekly cleanings of the wall.

26.    AIS also uses a proprietary sterilization process that combines two techniques – aseptic filtering and an AIS-developed terminal-sterilization process – that assures sterility of these medications.  Each medication goes through multiple rounds of aseptic filtering before the compounded medication is placed in syringes. The terminal sterilization then occurs after the medication is in the syringe to minimize the risk of any further contamination via handling post-sterilization. AIS's terminal sterilization process requires applying the right temperature, pressure and time parameters to the patient-specific prescriptions to achieve the

/ / /

highest level of sterility possible while preventing any potential damage to the medication.  AIS is the only provider in this space providing such exceptional level of terminal sterilization.  This sterilization process, which goes well past industry standard, allows AIS to achieve unprecedented sterility assurance and extends the Beyond-Use-Date of medications an average of over a month.  This unique process is necessary to allow for safe, long-term infusion of compounded medication through implanted pain pumps.

27.    A pharmacy technician then stages every labeled syringe, and a pharmacist inspects every syringe for any issues, double checks the volume, and confirms correct shipping.

28.    Rather than manufacture large, generic batches of medications, AIS develops its medications based on patient-specific care plans and conditions in close coordination and communication with a patient's health care professional. AIS compounds one prescription per patient every 30 to 180 days.

29.    AIS further provides additional resources, including care coordination and administrative services, to health care professionals and patients before, during and after infusion.  These services include support for patient onboarding, care coordination, management of medication delivery and infusion, pump maintenance, and patient billing.  AIS nurses and pharmacists work closely with physicians to develop care plans and dosing regimens. AIS has extensive infrastructure to support patients and providers during therapy.  In addition to producing and delivering patient-specific prescriptions of the highest quality from multiple, state-of-the-art facilities located across the US, AIS has a 170-member team of highly trained nurses to provide in-home or in-clinic refills and pump care, along with 24/7 support for patients and providers located across the US.

30.    AIS has established Care Connect, for example, a phone-based care management program that is made available to physicians, nurses and patients

/ / /

between their appointments.  Care Connect offers support to physicians and nurses, while offering patients direct access and communication with staffed nurses made available to patients 24-hour / 7-days a week / 365-days a year for access to nursing support and education, billing support and pharmacist support.  Care Connect is made available to every patient receiving medication from AIS.  Even if a particular patient does not utilize Care Connect, AIS needs to ensure sufficient staffing and availability to make this resource available to all of its patients when they need it.

31.    If a payor were to pay only for the act of injecting the medication into the pump and the raw drug material(s) itself, the payor would not be paying for any of the considerable work and resources needed for the successful home infusion therapy regimen.

**B. AIS Bills its Services and Medications According to Coding Standards Established by the NHIA and Approved and Adopted by CMS**

32.    AIS bills for its home infusion therapy services using an NHIA developed and federally approved standardized coding system, applied in accordance with NHIA Standards.

33.    NHIA is the industry-leading trade association that represents the interests of organizations that provide infusion and specialty pharmacy products to home-based patients.  NHIA was tasked with developing standardized coding for the home infusion provider and payer community at or around the time that the Federal Health Insurance Portability and Accountability Act in 1996 ("HIPAA") required that health care payers use standardized code sets and make electronic submissions available for claims.

34.    NHIA established a coding system based on per diem methodologies, the dominant reimbursement methodology used by providers and payers for infusion therapy, which were presented to and approved by CMS.  CMS agreed that the NHIA coding set would be accepted into the Healthcare Common Procedure

/ / /

Coding System ("HCPCS") system as a standard under HIPAA, starting with its updated set of HCPCS codes for 2002. This code list includes approximately 80 per diem-based codes for infusion therapy which have been standard and maintained by the federal government ever since.

35. The HCPCS codes used for home infusion therapy all start with "S." S-Codes represent HCPCS codes that were developed by request of Blue Cross Blue Shield Association for private payer use. The particular S-Code used for implanted pain pump therapy is S9328, which is described in the published HCPCS code book as "implanted pump pain management infusion; administrative services, professional pharmacy services, care coordination, and all necessary supplies and equipment (drugs and nursing visits coded separately), per diem." Thus, the federal coding system recognizes that infusion services include the per diem component, the drug itself which uses HCPCS "J-Codes" or National Drug Codes ("NDCs"), and nursing/physician charges, which are billed separately. S9328 is the per diem code AIS uses to bill for its infusion therapy services.

36. The National Definition of Per Diem, which is incorporated into the NHIA Standards, is "each day that a given patient is provided access to a prescribed therapy, beginning with the day the therapy is initiated and ending with the day the therapy is permanently discontinued." The National Definition also explains that it is not "necessary for the patient to receive an actual drug infusion each and every day in order to be considered covered under an existing per diem, so long as additional infusions are anticipated in the near future as prescribed in the physician plan of care." The rationale behind the per diem, in such a case, is that the provider anticipates continued responsibility for the patient throughout the infusion/treatment period, and incurs costs related to such responsibilities, remains accountable for the provision of such anticipated care, and is responsible for the

/ / /

/ / /

acquisition and allocation of resources that will be necessary to meet these obligations.

37.    Thus, per diem charges begin on the day the therapy is initiated and end when it is discontinued.[6]  For patients with pain pumps, the per diem thus applies each day they have access to a prescribed therapy - that is, each day the pump infuses medication to the patient.[7]  These therapies typically last 30 to 180 days.  Under these circumstances, there does not need to be any interaction between a health care provider or home infusion provider and the patient for a per diem charge to apply.  That is the point, and a critical benefit provided by AIS to Blue Shield's patients.

38.    The services rendered by AIS, the home infusion therapy provider, fit squarely within the description of per diem Code S9328.  The bundled services covered by the per diem S9328 charge include home infusion therapy, which in turn includes the infusing of medication via pain pumps, as well as "administrative services, professional pharmacy services, care coordination, and all necessary supplies and equipment."[8]

39.    NHIA Standards confirm that "professional pharmacy services" include, among other things, dispensing medication, patient counseling, "sterile compounding of medications," "[s]terile procedures" such as "clean room upkeep" and "other biomedical procedures necessary for  a safe environment," "[d]evelopment and implementation of pharmaceutical care plans," "[i]nitial and ongoing pharmacy patient assessment," and other services that directly describe the services provided and/or made available by AIS to every patient.[9]  As detailed above, AIS's infusion therapy services include the compounding of medication by

---

[6] NHIA Standards at 4.

[7] *Id.*

[8] *Id.*

[9] *Id.* at pgs. 94-95.

its specially trained pharmacists, which vary by patient need, including dosage and length of infusion.  Also included in these pharmacy services are the sterilization process required for each compounded medication, and AIS's other substantial investments, costs and efforts to make the high quality, safe medications so that they remain stable and continuously infusable for an extended period of time.  AIS also partakes in the development of patient-specific formulations of medication, and patient assessment.

40.    AIS's infusion therapy services also include "administrative services" and "care coordination" as contemplated under NHIA Standards.  "Care coordination" includes patient "admittance services" and "assessment," "training" and "education" for patients and caregivers, "delivery of medication," and "24 hours/day, 7 days/week availability for questions and/or problems of a dedicated infusion team consisting of pharmacist(s), nurse(s)" to perform "professional duties from pharmacy staff that do not require a patient visit."[10]   "Administrative services" includes "[m]aintaining inventories of drugs [and] equipment," "[p]ostage and shipping," "[d]esign and production of patient education materials," and providing billing support.  As detailed above, AIS provides and devotes significant resources to providing such "administrative" and "care coordination" services, many of which are made available by AIS to both patients and their clinical care givers around the clock, each and every day that its patients receive infusion therapy.  This includes the Care Connect service, and the nurses, pharmacists and customer care representatives that staff Care Connect 24/7/365.

41.    The NHIA Standards expressly provides that "Per diem reimbursement is intended to compensate for costs" to the "infusion therapy provider for providing this therapy, professional pharmacy, care coordination and administrative

/ / /

---

[10] *Id.* at pg. 96.

COMPLAINT; DEMAND FOR JURY TRIAL

services."[11]  The per diem charges are intended to reflect the home infusion providers' substantial investments, costs, and efforts to make high quality, safe drugs that remain safe, stable, and continuously infusible for an extended period of time, and to provide valuable patient support that is readily available if needed all year and around the clock.

**C. Blue Cross Blue Shield Association Has Reviewed and Approved AIS Healthcare's Billing for Home Infusion Therapy Services Using HCPCS Code S9328**

42.    AIS Healthcare's billing for home infusion therapy services under S9328 on a per diem basis was recently called into question by Blue Cross Blue Shield of Mississippi (BCBSMS).  BCBSMS asserted that AIS Healthcare's per diem billing under S9328 was unsupported by the services it provides, because a nurse or other clinician did not actually inject the patient with medication in the patient's home on each day that the per diem was billed.  This led to litigation between AIS Healthcare and BCBSMS which interested the Blue Cross Blue Shield Association (the "BCBS Association") because AIS Healthcare's compounding pharmacy is located in the state of Mississippi and BCBSMS is therefore AIS Healthcare's "local" Blue plan which administered claims for services rendered to members of Blue plans outside of Mississippi (like Blue Shield) and members of the Federal Employee Health Benefit Plan (FEHBP) for which the BCBS Association is a carrier.

43.    As a result of the AIS Healthcare – BCBSMS litigation, BCBSMS and the BCBS Association issued a statement that upon examination and review of AIS's billing practices, AIS was appropriately billing for its services under S9328 on a per diem basis and that "AIS' bills to BCBSMS, including without limitation AIS' bills using HCPCS Code S9328 for per diems, did not constitute fraud, and

---

[11] *Id.* at pg. 94.

made no finding of waste and abuse." A copy of this written statement is attached hereto as Exhibit A.

**D. AIS Healthcare Provides Home Infusion Therapy and Medication to Blue Shield Members**

44.     AIS Healthcare provides out-of-network implanted pain pump home infusion therapy and medications to members of health plans licensed by the BCBS Association across the country, including Blue Shield.

45.     Claims for these services used to be adjudicated by BCBSMS under the Blue Card Program, which permits members of one BCBS Association licensee ("Blue Plan") to obtain benefits from providers in another Blue Plan's service areas. Because AIS Healthcare is the nation's preeminent provider of specialized implanted pain pump home infusion therapy, physicians throughout the country will order and refer patients outside of Mississippi, including Blue Shield members that reside in California, to receive care home infusion therapy from AIS. When members with coverage from other Blue Plans receive service from AIS, if they do not have their own contract with AIS, then AIS would submit its bills to BCBSMS as the local Blue Plan.

46.     However, sometime around when the dispute between AIS Healthcare and BCBSMS began, BCBSMS terminated its home infusion therapy provider network agreement with AIS Healthcare and instructed that AIS Healthcare should bill services rendered to non-BCBSMS members to the member's plan, including California-resident members of Blue Shield.

47.     For the first few months that AIS Healthcare billed out-of-network home infusion therapy services and medications rendered to Blue Shield members directly to Blue Shield, Blue Shield properly processed and paid AIS Healthcare's claims, including claims for S9328 per diems charged for each day of the member's treatment between refills of the pump. However, after some time Blue Shield

/ / /

began denying AIS Healthcare's claims without providing clear explanation or reason for denial.

**E. Blue Shield Seeks Recoupment and Stops Paying for AIS Healthcare's Services and Medication Based on the False Pretense that AIS Healthcare Improperly Bills S9328 on a Per Diem Basis**

48.     On April 9, 2021, Blue Shield sent AIS Healthcare a letter requesting "office/medical records" and "all supporting documentation" regarding services and medications rendered by AIS healthcare to 37 Blue Shield members with dates of service ranging from 2018-2021.

49.     AIS Healthcare promptly submitted the requested records to Blue Shield over the course of the following several weeks, on May 10, May 11, June 14, June 15 and June 16, 2021.  These records included, among other things, the patient's treating physician prescriptions for specialty compounded medication for use in an intrathecal pain pump, the compounding record reflecting the manner and date in which the medication was compounded, delivery tickets, and delivery confirmations.

50.     On August 24, 2021, Blue Shield sent AIS Healthcare an overpayment demand, seeking recoupment in the amount of $1,319,020.04 for essentially every per diem and drug charge associated with the 37 member audit.  The only rationale provided was that the documentation provided by AIS Healthcare purportedly did not "substantiate the service codes billed."  A copy of this August 24, 2021 overpayment demand is attached as Exhibit B.

51.     On August 31, 2021, AIS Healthcare sent a letter in response to Blue Shield's overpayment demand, stating Blue Shield's demand lacked any information or explanation to support its purported overpayment, that Blue Shield's initial document request lacked any explanation as to the need for those documents or reason for audit, that AIS Healthcare's requests for Blue Shield's policies and

/ / /

other information had gone ignored, and a detailed explanation as to why AIS Healthcare's services support its per diem billing under Code S9328.  A copy of this August 31, 2021 letter is attached as Exhibit C.

52.    On October 11, 2021, Blue Shield sent AIS Healthcare a "Final Overpayment Demand Notification" asserting that during the audit Blue Shield purportedly "identified anomalous billing practices where the medical records did not meet the *Blue Shield* and/or its *subsidiaries Medical Policies, AMA-CPT Guidelines* and/or accepted standards of care and billing.  Yet, again, no further explanation was provided, or description of which guidelines, policies or accepted standards of care and billing were not being followed by AIS Healthcare.  Again, Blue Shield stated only that the documentation submitted by AIS Healthcare did not "substantiate the service codes billed."  A copy of this October 11, 2021 letter is attached as Exhibit D.

53.    AIS Healthcare asked for a brief extension to respond to Blue Shield's Final Overpayment Demand Notification, which was denied.

54.    On November 9, 2021, AIS Healthcare timely sent a detailed appeal and response to Blue Shield's October 11, 2021 "Final Overpayment Demand," again explaining that response was made difficult by Blue Shield's lack of transparency, and that AIS Healthcare properly bills for its services on a per diem basis under Code S9328.  This appeal and response was sent directly to Blue Shield's Special Investigations Unit (SIU), because the Final Overpayment Demand came from Blue Shield's SIU.  A copy of this November 9, 2021 letter is attached as Exhibit E.

55.    Accompanying the November 9, 2021 appeal letter was a spreadsheet identifying each alleged overpayment being disputed, a copy of the NHIA Standards and Per Diem Definition which conclusively establish AIS' proper

/ / /

/ / /

billing under S9328 on a per diem basis, and a packet of over 4,500 records, including clinical records, regarding the 37 patient audit.

56.     Blue Shield responded by instructing that the appeal needed to be re-sent via U.S. Mail to Blue Shield's "Initial Appeal Resolution Office."  AIS re-sent the packet as instructed on January 26, 2022, but Blue Shield reached out on April 4, 2022 to assert that it never received the hard copy appeal.  AIS re-sent the packet a third time on April 11, 2022, even though the appeal had already been received and reviewed by Blue Shield's SIU months prior.

57.     On October 10, 2022, AIS Healthcare finally received a response to its November 9, 2021 appeal and response letter, though Blue Shield's October 10, 2022 letter was dated June 15, 2022.  The October 10, 2022 letter stated only that "the appeal has been denied as there is no indication that the services included in procedure code S9328 were provided or anticipated to be provided to the patient." This letter indicated that Blue Shield was only pursuing overpayment recoupment on S9328 charges, and not on previously identified charges for medication.  A copy of this letter is attached as Exhibit F.

58.     Then, on November 28, 2022, Blue Shield sent AIS Healthcare a "Notice of Pre-Payment Claim Review," which indicated that due to purported "irregularities" in AIS Healthcare's billing, on grounds that there is purportedly "no indication that the services billed for CPT code S9328 … were provided," Blue Shield was placing AIS Healthcare on pre-payment claim review, so that Blue Shield would "continue to monitor" AIS Healthcare's "claim activity."  A copy of this notice of pre-payment claim review is attached as Exhibit G.

59.     On December 5, 2022, AIS Healthcare sent a "final appeal" of Blue Shield's overpayment demand.  This letter again describes in detail the services rendered by AIS Healthcare to Blue Shield members, explaining the definition and intended use of the S9328 per diem as set forth by NHIA and CMS, and explaining

/ / /

why AIS Healthcare is appropriately billing for its services under S9328 on a per diem basis.  This final appeal letter further explains that the BCBS Association has already reviewed and investigated AIS Healthcare's billing practices, including its billing under S9328, and determined that AIS Healthcare's billing under S9328 on a per diem basis was appropriate.  This final appeal letter also identified a number of claims that had been submitted by AIS Healthcare which were apparently being denied without reasonable justification, based solely on the false pretense that AIS Healthcare was not properly billing under S9328, and asked that Blue Shield process and pay those claims.  A copy of this final appeal letter is attached as Exhibit H.

60.     On December 7, 2022, AIS Healthcare sent Blue Shield a response to Blue Shield's notice of prepayment claim review, informing Blue Shield that in light of the definition of Code S9328, AIS' repeated explanations to Blue Shield regarding its proper billing under Code S9328, AIS' audit submissions of physician orders, compounding records and other documentation supporting its billing under S9328, and BCBS Association's confirmation that AIS Healthcare was appropriately billing under S9328, Blue Shield's pre-payment review flagging of AIS Healthcare is without merit and unlawful.  AIS Healthcare further explains that Blue Shield implementing a prepayment review flag on AIS Healthcare without reasonable justification is an "unfair payment pattern" prohibited by regulations enforced by the California Department of Managed Healthcare on licensed health plans like Blue Shield.  (See Cal. Health & Safety Code § 1371.37(a), (c)(1), (c)(2).)  AIS Healthcare requests in this letter that Blue Shield immediately remove AIS Healthcare from prepayment review, and begin timely and properly processing AIS Healthcare's outstanding claims.  A copy of this final appeal letter is attached as Exhibit I.

/ / /

/ / /

61.     To date, Blue Shield has not provided any response to AIS Healthcare's December 5, 2022 final appeal letter, and December 7, 2022 response to notice of pre-payment claim review.

62.     Blue Shield began denying an increasing number of AIS Healthcare claims for home infusion therapy services billed under S9328, without providing reasonable reasons for denial, months before Blue Shield first initiated its audit of AIS Healthcare claims in its April 9, 2021 request for medical documentation.  The rate of Blue Shield's improper denials then increased until late-2021.  Since late-2021, almost every claim submitted by AIS Healthcare to Blue Shield has been denied.

63.     AIS Healthcare has provided Blue Shield members with critical, medically necessary home infusion therapy and medications, prepared and rendered in accordance with orders from each members' treating physicians.  AIS Healthcare has requested and obtained authorization from Blue Shield for the services and medications rendered for most claims in dispute.  For others, express authorization for the out-of-network coverage was not required pursuant to the terms of the members' plan, and/or because Blue Shield authorized the implantation of the members' pain pump with knowledge that the implanted pain pump would, and must, be filled with compounded medication prepared in accordance with the treating physician's care plan, and that AIS Healthcare would be providing that medication to the member.  Blue Shield has also began improperly refusing authorization requests for AIS's services even though AIS's services are medically necessary, ordered and recommended by its members' treating physicians and even though Blue Shield is aware that the member has an implanted pain pump that cannot "run dry" and must be filled on a regular basis.  Blue Shield has never indicated to AIS Healthcare, and AIS Healthcare is informed and believes that it has not identified to its patients, an in-network home infusion therapy provider that

/ / /

COMPLAINT; DEMAND FOR JURY TRIAL

can provide the services and medications currently being provided by AIS Healthcare as part of refilling its members' implanted pain pumps.

64. Blue Shield's newfound refusal to pay AIS Healthcare based on the position that AIS Healthcare's services are not billable under S9328 is contrary to the definition of S9328 drafted by the NHIA and published by CMS, as understood by the parties, and as understood by the BCBS Association of which Blue Shield is a licensee, which includes much more than just the filling of the pain pump. AIS Healthcare's services in administering infusion therapy fall squarely within the description of and purpose for Code S9328. Code S9328 has no requirement that there is a daily interaction by a provider with a patient for a per diem charge to apply. Nor does Blue Shield have any policy or contract stating that S9328 requires daily interaction by a provider with a patient at the patient's home.

65. Indeed, the specialized context of pain pump infusion therapy does not allow for Blue Shield's incorrect application of S9328. In the context of an implanted pain pump, by design there are no daily in-person interactions between the provider and the patient. There also is no daily activity by the doctor filling the implanted pain pump, as the fill by the doctor is intended to occur just one time and takes the same amount of time for him or her, regardless of the number of days that the medication will be infused through the pain pump. The only provider who provides anything that varies based on the number of days contemplated for this therapy is AIS Healthcare. The services by AIS Healthcare will vary based on the quantity of dosage and complexity of medication that needs to be compounded depending on the number of days contemplated for the therapy. Further, the 24/7 support provided by AIS Healthcare to the patient and the doctor will vary by nature depending on the number of days that the patient is receiving infusion through the implanted pain pump. On the other hand, the act of "filling the pump" by a medical professional occurs only in a single instance, no matter the period of

/ / /

time that the implanted pain pump is intended to be infusing the medication into the patient. This single touch, by the doctor, is the entire point of the implanted pain pump rather than being restricted or immobilized for days while hooked up to machines and/or repeatedly injected with needles in a hospital or clinic setting. In the implanted pain pump context, a per diem concept is incongruent with requiring in-person infusions or visits each day.

66.    Blue Shield's improper positions and reasons for flagging and denying AIS Healthcare's claims are being used as a means to deprive AIS Healthcare of payment. Blue Shield's reasons for not paying AIS Healthcare are not the reasons given on Blue Shield's explanations of benefit or remittances, which are merely a pretext, but instead related to this recently implemented and newly concocted rationale that it does not need to pay AIS Healthcare for the infusion therapy services it provides.

67.    AIS Healthcare has nevertheless continued to provide its services to Blue Shield members despite Blue Shield's refusal to process and pay AIS Healthcare's claims, in light of the significant harm its patients, Blue Shield's members, would face without its vital infusion therapy services. For example, some of these members are in need of continuing care by AIS Healthcare, whose health would have been put at risk by sudden disruption of AIS Healthcare's implanted pain pump infusion therapy after contract termination. Some members have a right to choose medically necessary out-of-network services under PPO plans, and their treating physicians have ordered or recommended implanted pain pump therapy from AIS Healthcare and/or the member has otherwise obtained express or implied authorization for AIS Healthcare's services. Yet, Blue Shield continues to refuse to pay AIS Healthcare's charges, risking disruption to AIS' provision of home infusion therapy to its member patients, who have significant, chronic conditions and cannot go without the medications that AIS Healthcare

///

dispenses and administers. Blue Shield is unnecessarily placing its members at risk, because AIS Healthcare cannot continue to afford providing services and medications without any promise of fair and appropriate payment.

## **FIRST CAUSE OF ACTION**

### **(Breach of Implied-in-Fact Contract)**

68.   AIS Healthcare reincorporates each of the above paragraphs.

69.   AIS Healthcare and Defendants entered into implied-in-fact contracts through their course of conduct for services that were pre-certified or authorized by Blue Shield, or for services where pre-certification was not needed (e.g., PPO services, or services that do not require pre-certification under the terms of the patients' plans), whereby AIS Healthcare then provided services to the patients and Blue Shield thereby agreed to pay for such services. AIS Healthcare and/or the patient's treating physician communicates directly with Blue Shield or their designated agents to verify eligibility and request pre-certification for infusion therapy and medications.

70.   The prices offered for the services provided by AIS Healthcare and the expectation to be paid for infusion therapy services on a per diem basis were known to Blue Shield based on long-standing course of conduct, and bills previously received by Blue Shield from AIS Healthcare for parallel services.

71.   By pre-certifying or otherwise approving AIS Healthcare to provide services or agreeing to pay for such services where pre-certification was not required, e.g., continuing care for members who received authorization or pre-certification for the implantation of a pain pump or for AIS Healthcare services, or for PPO services, with full knowledge of AIS Healthcare's usual and customary charges for services and medications rendered, Blue Shield through their words and conduct accepted AIS Healthcare's offer and agreed to pay AIS Healthcare's usual and customary charges for said services and medications.

/ / /

72.     AIS Healthcare rendered express or impliedly authorized services, in accordance with the implied-in-fact contracts described herein, and billed Blue Shield for those services based on instruction from Blue Shield directly, and/or from BCBSMS and/or the BCBS Association acting on Blue Shield's behalf.  AIS Healthcare is entitled to be paid based on its usual and customary charges, which are in-line with similar providers and reflect the specialized and valuable nature of the pain pump infusion therapy it offers.

73.     Blue Shield breached these implied-in-fact contracts by failing to reimburse AIS based on its usual and customary charges, or for that matter, failing to reimburse AIS at all.

74.     AIS Healthcare has performed all of the obligations required of it under its implied-in-fact contracts with Blue Shield.

75.     AIS Healthcare has demanded Blue Shield pay for the services and medications provided to Blue Shield's members and has sent claims information to Blue Shield for pricing, processing and payment.  AIS Healthcare has demanded payment from Blue Shield on numerous occasions and have objected to Blue Shield's unilateral decisions to deny payment or refuse to process claims for the treatment and medications provided to Blue Shield's members.

76.     Blue Shield's payment for prior services and medications rendered to the same and to other members for the same types of services and medications prior to Blue Shield's systematic denial of all requests for authorization and payment made by AIS Healthcare, is an acknowledgement by Blue Shield of its coverage for AIS Healthcare's services and medications, and its responsibility under and implied-in-fact contract to reimburse AIS Healthcare for those services and medications.

77.     As a direct and proximate result of Blue Shield's breach of implied contract, AIS Healthcare has been damaged in an amount to be proven at trial,

/ / /

which is estimated to be no less than $7 million in principal and growing, and applicable interest.

## SECOND CAUSE OF ACTION

### (Breach of Implied-in-Law Contract)

78.     AIS Healthcare reincorporates each of the above paragraphs.

79.     AIS Healthcare has conferred substantial and valuable benefits on Blue Shield in the form of rendering critical home infusion therapy services to Blue Shield's members, which have benefitted Blue Shield.

80.     AIS Healthcare expended significant time and resources developing, delivering, dispensing, administering, and/or otherwise providing Blue Shield's members with home infusion therapy and related services with the intent of receiving compensation from Blue Shield payable on a per diem basis based on NHIA standards and established course of dealing between the parties.

81.     AIS Healthcare conferred these benefits directly to Blue Shield with Blue Shield's express knowledge, and where needed authorization or approval of Blue Shield, express or implied.  When AIS Healthcare provided medications and infusion therapy to Blue Shield for their members, Blue Shield directly received the benefit of having their obligations for arrangement of and payment for health care services to its members discharged.

82.     AIS Healthcare is informed and believes that Blue Shield's members pay premiums to Blue Shield in return for medical insurance and/or coverage under a health care service plan that includes coverage for home infusion therapy services and medically necessary medications.  Accordingly, in providing home infusion therapy services and medications to Blue Shield's members, AIS Healthcare intended to and has conferred a benefit on Blue Shield.

/ / /

/ / /

/ / /

83.   AIS Healthcare did and continues to provide services to Blue Shield's members with reasonable expectation of payment from Blue Shield, and with Blue Shield's knowledge that AIS Healthcare expects to be paid for those services.

84.   Blue Shield has enjoyed the benefit of having access to AIS Healthcare's services without compensating and reimbursing AIS Healthcare for such services.

85.   Equity and good conscience require Blue Shield to compensate AIS Healthcare for the substantial benefits AIS Healthcare has conferred on Blue Shield.

86.   AIS Healthcare is entitled to damages and restitution from Blue Shield. AIS Healthcare is further entitled to declaratory and injunctive relief, as well as all other available remedies, as set forth in its Prayer for Relief.

87.   As a direct and proximate result of Blue Shield's breach of implied contract, AIS Healthcare has been damaged in an amount to be proven at trial, which is estimated to be no less than $7 million in principal and growing, and applicable interest.

## THIRD CAUSE OF ACTION

### (Enforcement Under 29 U.S.C. § 1132(a)(1)(B) for Failure to Pay ERISA Plan Benefits)

88.   AIS Healthcare reincorporates each of the above paragraphs.

89.   This claim is alleged by AIS Healthcare for relief in connection with claims for treatment rendered to patients covered by a health benefits plan governed by ERISA where AIS has obtained an assignment of benefits.

90.   This is a claim to recover benefits, enforce rights and clarify rights to benefits under 29 U.S.C. § 1132(a)(1)(B).  ERISA allows a participant or beneficiary covered by a welfare benefit plan to sue to recover benefits due under the terms of his plan or to enforce rights under the terms of the plan.

/ / /

91.    AIS Healthcare has obtained assignment of health care benefits provided by Blue Shield for a number of Members enrolled in ERISA plans and are therefore entitled to recover benefits due to these Members under the terms of Blue Shield's member plans, in AIS Healthcare's capacity as assignees of these Blue Shield members.  Providers who are beneficiaries pursuant to assignments have standing to assert the claims of their assignors against health plans.  AIS Healthcare's rights derived from the assignments are separate and apart from AIS Healthcare's independent direct rights under the facts and law alleged above and in the other causes of action.

92.    These assignments of health care benefits are contained in "Financial Responsibility / Assignment of Benefits" forms signed by members which include language identical or substantively identical, such as the following: "I assign and transfer to AIS Healthcare, its agents and assigns, any and all rights to receive any insurance benefits otherwise payable to me for products or services provided by AIS Healthcare.  I authorize my insurance company or its agents to furnish AIS Healthcare, its agents and assigns, any and all information pertaining to my insurance benefits and status of claims submitted by AIS Healthcare, its agents and assigns."

93.    When AIS Healthcare submitted claims to Blue Shield, it informed Blue Shield that it had obtained and accepted assignment of the member's benefits with Blue Shield, by checking the appropriate box on section 27 of the industry standard CMS-1500 Health Insurance Claim Form or the analogous electronic submission that was presented to Blue Shield for each claim at issue.

94.    ERISA authorizes actions under 29 U.S.C. § 1132(a)(1)(B) to be brought against the ERISA plans' administrators.  AIS Healthcare is informed and believes that Blue Shield insures, sponsors, funds, services as the designated plan administrators and/or serves as the named plan administrator's "designee" for the

/ / /

COMPLAINT; DEMAND FOR JURY TRIAL

various ERISA health plans at issue, and/or functions as a de facto plan administrator for the claims at issue whether or not Blue Shield has been formally designated as the plan administrator, by, among other things, receiving benefit claims, evaluating and processing claims, making benefit determinations, and/or handling appeals of benefit determinations.

95.    AIS Healthcare is informed and believes that Blue Shield's plans provide that it will reimburse medically necessary, covered services rendered by AIS.  By using the above tactics to avoid paying claims and otherwise filing to pay for AIS's medically necessary services provided to Blue Shield for its members, Blue Shield has failed to process and pay in accordance with the Blue Shield plans.

96.    Moreover, the formal mechanism for a health plan or plan administrator to explain why a claim is denied (meaning that the allowed amount is anything less than full billed charges) is an explanation of benefits ("EOB").  Blue Shield was required to issue EOBs in conformance with 29 U.S.C. § 1133 as implemented by 29 C.F.R. 2560.503-1.  Specifically, under 29 C.F.R. § 2560.503-1(g), it was required to:

> . . . provide a claimant with written or electronic notification of any adverse benefit determination.  Any electronic notification shall comply with the standards imposed by 29 CFR 2520.104b-1(c)(1)(i), (iii), and (iv).  The notification shall set forth, in a manner calculated to be understood by the claimant –
>
> (i)    The specific reason or reasons for the adverse determination;
>
> (ii)    Reference to the specific plan provisions on which the determination is based;
>
> (iii)    A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;
>
> (iv)    A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action

under section 502(a) of the Act following an adverse benefit determination on review;

(v)    In the case of an adverse benefit determination by a group health plan or a plan providing disability benefits,

(A)    If an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination, either the specific rule, guideline, protocol, or other similar criterion; or a statement that such a rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of such rule, guideline, protocol, or other criterion will be provided free of charge to the claimant upon request; or

(B)    If the adverse benefit determination is based on a medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request.

(vi)    In the case of an adverse benefit determination by a group health plan concerning a claim involving urgent care, a description of the expedited review process applicable to such claims.

97.    Strict compliance with these requirements is now necessary, and only *de minimis* errors will be excused.  29 C.F.R. § 2590.715-2719(b)(2)(ii)(F)(1).  The errors here were far from *de minimis*.

98.    Blue Shield's EOBs did not comply with the ERISA regulations, including by not stating the specific and/or actual reasons for its failure to pay claims at the proper rate, providing any of the details required by the law, or requesting more information if needed as required by law.

99.    To the extent there are any claims not fully appealed, in light of Blue Shield's breach of its obligations (including, but not limited to, Aetna's insufficient EOBs), and systematic failures, nonetheless, the ERISA regulations provide that the claimants "shall be deemed to have exhausted the administrative remedies under the plan . . . ."  29 C.F.R. § 2560.503-1(l).  Similarly, because of Blue Shield's nonsensical explanations for the denials of AIS Healthcare's claims in its EOBs and

other communications, any appeals by AIS Healthcare would have been futile.

100.    Pursuant to 29 U.S.C. § 1132(a)(1)(B), AIS as assignees of Blue Shield members are entitled to recover benefits due to them under the terms of the members' plans and can enforce and clarify their rights under the terms of such plans.

101.    As a result of Blue Shield's underpayment of benefits, it is liable to AIS Healthcare for the difference between what should have been paid and the amounts that were actually paid, plus applicable interest and attorneys' fees.

## FOURTH CAUSE OF ACTION

### (Enforcement Under 29 U.S.C. § 1132(a)(3) for Failure to Properly Handle Claims)

102.    AIS Healthcare reincorporates each of the above paragraphs.

103.    This claim is alleged by AIS Healthcare for relief in connection with claims for treatment rendered to patients covered by a health benefits plan governed by ERISA.  This is a claim pursuant to 29 U.S.C. § 1132(a)(3), to redress Defendants' failures to comply with 29 U.S.C. § 1133 and the implementing regulations set forth at 29 C.F.R. § 2560.503-1.

104.    As set forth above, AIS Healthcare has standing to pursue these claims as an assignee of its patients' benefits under health benefit plans governed by ERISA.

105.    AIS Healthcare, as assignee of ERISA plan participants and beneficiaries, is entitled to certain procedural protections concerning the manner in which its claims are handled, including the specific reasons for the denial of claims and a "full and fair review" of all denied claims.  *See* 29 U.S.C. § 1133.

106.    When AIS Healthcare received Explanations of Benefits or Remittance Advices from Blue Shield, these notices failed to disclose the reasons for the benefits determination with sufficient specificity.

/ / /

107.    Similarly, Blue Shield failed to comply with the procedural requirements of ERISA, the Secretary of Labor's implementing regulations, or, upon information and belief, the terms of the respective ERISA plans at issue.  Blue Shield denied AIS Healthcare the opportunity for a "full and fair review" of denied claims, *inter alia*, by:

> (a)    Flagging AIS Healthcare for automatic denial of authorization requests and pre-payment review without reason or justification;

> (b)    Failing to fully disclose the reasons, rationales or sources supporting the adverse determinations;

> (c)    Failing to disclose with specificity the reasons for the adverse determinations;

> (d)    Failing to make reference to the specific plan provisions on which the benefit determinations or review determinations were based;

> (e)    Failing to provide AIS Healthcare with a sufficient description of the plan's review procedures;

108.    Blue Shield's failure to comply with the procedural requirements of ERISA, the Secretary of Labor's implementing regulations, the terms of the Other Payors' respective ERISA plans, and federal common law results in the administrative remedies of AIS Healthcare being deemed exhausted.  *See* 29 C.F.R. § 2560.503-1(l).

109.    By reasons of the foregoing, AIS Healthcare is entitled to a declaration by this Court that Blue Shield's actions as alleged herein are in violation of Blue Shield's duties and obligations under ERISA, and an injunction requiring Blue Shield to comply with their duties and obligations under ERISA, including calculating past and future benefits based on the terms of the Other Payors' respective ERISA plans.

/ / /

/ / /

## FIFTH CAUSE OF ACTION

### (Breach of Contract by Assignment)

110.    AIS Healthcare reincorporates each of the above paragraphs.

111.    AIS Healthcare is informed and believe that Blue Shield members have written contracts with Blue Shield, in which Blue Shield promises to pay for home infusion therapy services and medication provided by out-of-network providers.  AIS Healthcare is informed and believes that Blue Shield collects premiums, fees and subsidies in return for its promise to pay for such services.

112.    AIS Healthcare enters into written agreements with Blue Shield members, in which the patients assign the benefits of their Blue Shield coverage to AIS Healthcare.  AIS Healthcare thus are assignees of the rights that Blue Shield members have in their written contracts with Blue Shield, including the right to pay for home infusion therapy services and medications provided by out-of-network providers.

113.    AIS Healthcare are informed and believe that Blue Shield members have performed all obligations required of them by their written contracts with Blue Shield, and that Blue Shield has breached those contracts by failing to pay AIS Healthcare for covered home infusion therapy and medications.

114.    AIS Healthcare has been damaged by Blue Shield's breach of those written contracts, in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

### (Services Rendered)

115.    AIS Healthcare reincorporates each of the above paragraphs.

116.    AIS Healthcare provided medically necessary home infusion therapy services and medication to Blue Shield's members.  By words or conduct, Blue Shield requested that AIS Healthcare perform such services.  As a result, Blue

/ / /

/ / /

COMPLAINT; DEMAND FOR JURY TRIAL

Shield became indebted to AIS Healthcare for the services and medications rendered to Blue Shield members.

117. Blue Shield has failed and refused, and continues to refuse, to timely and properly pay AIS Healthcare for the medical services it has provided to the Blue Shield's members. Instead, Blue Shield has unilaterally decided to delay and deny payment.

118. AIS Healthcare has demanded, on numerous occasions, that Blue Shield pay for the services they have provided to Blue Shield's members, and have objected to Blue Shield's failure to timely and properly pay AIS Healthcare for the treatment provided to Blue Shield's members.

119. Accordingly, there is now due, owing and unpaid from Blue Shield to AIS Healthcare in an amount to be proven at trial, plus applicable statutory interest.

## <u>SEVENTH CAUSE OF ACTION</u>

### (Unfair Business Practices)

120. AIS Healthcare reincorporates each of the above paragraphs.

121. Blue Shield has engaged in unfair and/or unlawful business acts and practices by, *inter alia*:

(a) Failing to timely process and properly pay AIS Healthcare for home infusion therapy services, supplies and medications based on the false pretense that AIS Healthcare is not billing appropriately for the services rendered, even with full knowledge that AIS Healthcare's billing process is appropriate;

(b) Implementing a prepayment review flag on AIS Healthcare under the false pretense that AIS Healthcare is not billing appropriately for the services rendered, resulting in unreasonable delay in processing and/or non-processing and nonpayment of AIS Healthcare claims;

COMPLAINT; DEMAND FOR JURY TRIAL

(c)    Voluntarily choosing to authorize implantation of pain pumps, home infusion therapy services, and/or medication for use in an implanted pain pump, but refusing to pay AIS Healthcare for home infusion therapy services and medications;

(d)    Denying AIS Healthcare claims without providing reasonably specific explanation;

(e)    Each of the above actions and conduct constitutes an "unfair payment pattern" prohibited by California regulation applicable to DMHC-licensed health plans like Blue Shield. (See Cal. Health & Safety Code § 1371.37(a), (c)(1), (c)(2).)

122.   This conduct by Blue Shield constitutes illegal and unfair business practices under California Business and Professions Code section 17200 *et seq.*

123.   AIS Healthcare seeks an injunction requiring Blue Shield to cease and desist from refusing to process or pay claims, and from flagging AIS Healthcare for prepayment claims review, based on the rationale that AIS Healthcare should not be billing its services under S9328 on a per diem basis.

124.   AIS Healthcare seeks restitution of an amount to be proven at trial, which is the amount that Blue Shield kept which it was obligated to pay AIS Healthcare for the services they provided to Blue Shield's members.

## **PRAYER FOR RELIEF**

WHEREFORE, AIS Healthcare prays for judgment against Blue Shield and DOES 1 through 10 as follows:

1.    For any and all damages available under the law, in an amount to be proved at trial, but currently estimated to exceed $7 million in principal, plus applicable statutory interest;

2.   For restitution from Blue Shield in an amount to be proven at trial, plus applicable statutory interest;

3.   An injunction prohibiting Blue Shield and DOES 1 through 10 from refusing to process or pay claims, and from flagging AIS Healthcare for prepayment claims review, based on the rationale that AIS Healthcare should not be billing its services under S9328 on a per diem basis

4.   Costs of suit herein, as permitted by law;

5.   Attorney's fees, as permitted by law;

6.   Any and all such further relief that the Court deems just and proper.

Dated:  February 28, 2023               KING & SPALDING LLP


                                        By:  /s/ Jonathan H. Shin
                                        GLENN SOLOMON
                                        PETER STROTZ
                                        JONATHAN SHIN

                                        Counsel for AIS Healthcare

COMPLAINT; DEMAND FOR JURY TRIAL

## **DEMAND FOR JURY TRIAL**

Pursuant to Rules 38 and 81 of the Federal Rules of Civil Procedure, Plaintiff Bond Pharmacy, Inc. d/b/a AIS Healthcare hereby demands a trial by jury in this action on all issues so triable as of right.

Dated:  February 28, 2023                    KING & SPALDING LLP


By:  */s/ Jonathan H. Shin*
GLENN SOLOMON
PETER STROTZ
JONATHAN SHIN

Counsel for AIS Healthcare

COMPLAINT; DEMAND FOR JURY TRIAL